**UNITED STATES DISTRICT**
**DISTRICT OF MASSACHUSETTS**


| | |
|---|---|
| UNITED STATES OF AMERICA,       ) | |
|          PLAINTIFF,             ) | |
|          vs                     )  No. 1:23-CR-10162 | |
| JOHNNY BARROS BRANDAO,          ) | |
|          Defendant.             ) | |


BEFORE THE HONORABLE NATHANIEL M. GORTON
UNITED STATES DISTRICT JUDGE
PRETRIAL CONFERENCE -- FINAL



John Joseph Moakley United States Courthouse
Courtroom No. 4
One Courthouse Way
Boston, Massachusetts  02210

WEDNESDAY, SEPTEMBER 18, 2024
9:30 A.M.



Catherine L. Zelinski, RPR, CRC
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3-205
Boston, Massachusetts  02210
Email: CAL.Zelinski.Steno@gmail.com




Mechanical Steno - Computer-Aided Transcript

**APPEARANCES:**

Brian James Sullivan
United States Attorneys Office
One Courthouse Way
Boston, MA 02110
Phone: 617-748-3106
Email: Brian.sullivan@usdoj.gov


David G. Tobin
United States Attorneys Office
One Courthouse Way, Suite 9200
Boston, MA 02210
Phone: 617-748-3392
Fax: 617-748-3965
Email: David.Tobin@usdoj.gov
for Plaintiff.


Jillise M. McDonough
Law Office of Rosemary C. Scapicchio
107 Union Wharf
Boston, MA 02109
Phone: 617-263-7400
Email: Mcdonough.attorney@gmail.com
for Defendant.

**P R O C E E D I N G S**

THE CLERK:  All rise.

(The Honorable Court Entered.)

THE CLERK:  Thank you.  You may be seated.

This is Criminal Action No. 23-10162, the *United States of America versus Johnny Barros Brandao*.

Would counsel please identify themselves for the record.

ATTORNEY SULLIVAN:  Good morning, your Honor.  AUSA Brian Sullivan on behalf of the United States.

THE COURT:  Good morning.

ATTORNEY TOBIN:  And good morning, your Honor.  David Tobin also on behalf of the United States.

THE COURT:  Mr. Tobin, good morning to you.

ATTORNEY McDONOUGH:  Good morning, your Honor.  Jillise McDonough for Mr. Brandao.

THE COURT:  Ms. McDonough and Mr. Brandao, good morning to you.

We're here on a final pretrial conference in this case.  But before we get to that, I will note that I just received last night, or early this morning, another motion from the defendant to suppress suggestive identification.  I know the government has not had a chance to respond to that, and we can -- I will give the government a chance to respond in writing before I make any ruling.  But if you wish to comment

on it briefly at some point before the end of these proceedings, I will hear you both.  This says, as I said before, is a final pretrial conference in a case that is scheduled to go to trial on Monday, September 30.  That's not next Monday, but a week from Monday, at nine a.m.  The trial is going to begin immediately after impanelment and will proceed day-to-day.  The only conflict that I am aware of now is that on Tuesday afternoon we will not have a session because the Court has its monthly judge's meeting that day.  So on Tuesday, we'll go nine to one, but every other day we'll have afternoon sessions.

There are, at least there were before the most recent filing, four pending motions in limine; two filed by the government and two filed by the defendant.  The first one is the defendant's motion in limine to exclude the so-called overview testimony.  It's Docket No. 87.  The defendant moves to exclude any overview testimony that federal agents may give to describe overall investigation.  The government responds that each of the officers and investigating agents it plans to call will testify only as to their personal knowledge of the case.  Therefore, the defendant's motion is denied without prejudice.  Defendant is of course free to object at trial if he believes that a government witness is overstepping the bounds of federal abundance 701.

Next, the government's motion in limine to admit

evidence regarding the defendant's criminal charges in Cape Verde, that's Docket No. 85, and the countermotion of the defendant's in limine to exclude reference to the murder charges and underlying allegations is Docket 86.  The parties have filed competing motions in limine regarding the admissibility of the nature of Mr. Brandao's pending criminal charges in Cape Verde.  The government seeks to admit evidence of the charges Defendant is facing back there.  It contends that the nature of the offenses is relevant to proving the defendant's knowledge, willfulness, and motive, and that the probative value of this evidence outweighs any risk of unfair prejudice.

The government clarifies that it is not seeking to admit evidence of the factual allegations underlying the charges.

The defendant moves to excluding reference to those charges and related allegations.  He argues that a reference to the charges will serve as improper propensity evidence. Testimony regarding the underlying factual allegations would be based on inadmissible hearsay, and the testimony of either the charges or the underlying facts would be unfairly and substantially more prejudicial than probative.

The government correctly argues that evidence of the charges is admissible because it may be proffered to prove Defendant's knowledge, motive, or willfulness, all of which are

permissible under Federal Rule of Evidence 404(b)(2).

The government is not asking a jury to infer that because Defendant may have committed violent crimes in the past, he is more likely to have committed past work fraud in this case.

Both the existence and the gravity of the outstanding criminal charges are probative of the defendant's knowledge and motive in this case.  Without any awareness of the charges the jury would have no explanation as to why Mr. Brandao would bother to falsify an ostensibly immaterial detail in his past court application.  Nevertheless, the Court is aware that the probative value of the charges must not be "substantially outweighed by the danger of unfair prejudice."

Certainly, a charge as gruesome as the attack upon the integrity of the cadaver or ashes is a shocking and heinous crime that might invite the jury to render a verdict on improper emotional -- on improper and emotional basis.  Taking all of this into consideration, the Court denies the defendant's motion and allows the government's motion insofar as the government complies with the following conditions:

First, it will be permitted to proffer that Mr. Brandao has been charged with, "serious offenses including homicide."  But may not refer to any of the charges specifically other than a homicide charge -- charges.

And second, it will be permitted to report the maximum

penalties that Mr. Brandao faces for the charged offenses, but may not refer to any of the factual allegations underlying those charges.

Furthermore, to mitigate any risk of the jury construing the evidence as improper character evidence, the Court will give a limiting instruction to the jury.  That is -- that it is to consider the evidence for the purposes of the defendant's motive, knowledge, or willfulness.

And, of course, if the parties can reach an alternative agreement that comports with the terms of this Court's ruling, the parties are free to do so.

Finally, the Court cannot yet evaluate the admissibility of any hearsay evidence relating to the charges. The government has indicated that it intends to prove the charges via Cape Verdean court records that fall within the public records' exception to the hearsay rule under Federal Rule of Evidence 8038.  Until such time as the Court can assess the actual evidence at issue, I will defer ruling on its admissibility under that exception.

Finally, the government's motion in limine to admit Cape Verdean court records as self-authenticated documents, which is Docket No. 84.  The government seeks to admit court records from Cape Verde relating to Brandao's detention and the seizure of his passport.  It submits that the records are admissible because first, they are self-authenticating.

Second, they satisfy the public records' exception for hearsay.

And, third, they do not violate Mr. Brandao's confrontation rights.

The government's motion is denied without prejudice. As an initial matter, the government has not provided the Court with either the records at issue or their English translations.

The Court cannot assess the admissibility or authenticity of records it has not seen.

On the question of authenticity, the government will have to provide more than just the certifications for the original Portuguese versions of the court records attached as Exhibits 1 and 2. Because the records must be translated into English, the government will also need to certify the accuracy of those translations. The records may be admitted later if the government can show that the records are self-authenticating and otherwise satisfy the relevance of the public's exception to hearsay.

However, the records must be redacted to conform with this Court's earlier ruling limiting reference to the Cape Verdean criminal charges. Again, alternatively the parties are free to stipulate to the contents of the records.

That concludes my rulings on the in limine motions. Do counsel have anything to add?

ATTORNEY TOBIN: Ever so briefly, your Honor, if I

might.

THE COURT:  Mr. Tobin.

ATTORNEY TOBIN:  Thank you, your Honor.

With regard to the Cape Verdean records, and I do apologize, it was clearly a large oversight on the government's part, we should have provided the records.  And more importantly, we should have provided the translated English copies of those records.  It does put the Court sort of in a bind to make a determination on records they don't see.  So my question is as follows, your Honor, if I might:

Would the Court like the government to provide those to the Court as early as today or does the Court prefer to wait until the trial?  The government would prefer to give it to the Court because you may then be able to make a decision which can guide the presentation of evidence, openings, and that nature.

THE COURT:  You can provide it as soon as you want, but counsel may be aware that the Court is going to be out of the country for one week and then on judicial business on the judicial panel for multi-use litigation through the end of next week.  So that I will next be in the court after today, on the day we impanel --

ATTORNEY TOBIN:  Okay, understand.

THE COURT:  -- September 30.  Okay?

ATTORNEY TOBIN:  I will get them and I do apologize.  Thank you.

THE COURT:  Okay.

Anything from the defendant?  Ms. McDonough.

ATTORNEY McDONOUGH:  Yes, your Honor.

Does your Honor anticipate making a ruling on that after seeing the records or before opening statements or at the time of the --

THE COURT:  I'm going to make them as timely as I can --

ATTORNEY McDONOUGH:  Okay.

THE COURT:  -- and ahead of the time you have to present your case.

ATTORNEY McDONOUGH:  Okay, all right.  Thank you, your Honor.

THE COURT:  Okay.

All right, then turning to the witness and exhibit lists, the defendant has listed his potential witnesses without providing the names of either their employers or the towns of their residences.  The Court must be able to identify all potential witnesses, not just from their names, but also from the towns where they live or for whom they work so that the jury pool has -- may avoid any potential conflicts.  So I need that information promptly, Ms. McDonough.

ATTORNEY McDONOUGH:  Yes, your Honor, I'll provide that.

THE COURT:  Okay.

Then with respect to objections to the witness or exhibit list, the Court received objections from both parties regarding opposing parties' exhibit and/or witness lists. Defendant objects to a number of the government's proposed exhibits based on, among other things, hearsay, violation of having Sixth Amendment right to confrontation, relevance, and prejudice, et cetera. The objections are overruled. The defendant is free to renew his objections in the context of trial if particular issues arise.

The government objects to anticipated testimony from the defendants to attorney witnesses in Docket No. 101. It contends that the witnesses will testify in support of a necessity defense, and asserts that the defendant may not present that defense as a matter of law.

The Court is unaware of what defenses, if any, Defendant plans to offer. It is also unaware of what evidence defendant plans on proffering with respect to those defenses. If as the government alleges, Mr. Brandao's two witnesses plan to testify about prison conditions in Cape Verde, I am skeptical about their qualifications and/or foundation for such testimony, but I will hear Ms. McDonough in that regard.

ATTORNEY McDONOUGH: Your Honor, we don't anticipate on presenting, as the government outlined, some sort of, you know, mythical, there may have been violence in the Cape Verde prisons. And I think I'd like to start off with the fact that

the, the elements that are outlined by the government in their opposition to our witness list seem to define duress rather than the defense that we would be potentially pursuing which is the request for jury instruction that I included for necessity. I understand that the Court has collapsed duress.

THE COURT:  What evidence are you going to have of necessity?

ATTORNEY McDONOUGH:  So, your Honor, I anticipate on potentially calling both of Mr. Brandao's attorneys.  One now lives in the United States, one still lives in Cape Verde, but they both did represent Mr. Brandao on the offenses.  So the necessity the defense would come both from the documents that the government seeks to admit as far as --

THE COURT:  What are you going to ask those attorneys to testify to?

ATTORNEY McDONOUGH:  I would ask them to testify as to -- they did observe the conditions of the confinement that Mr. Brandao was under while he was in Cape Verde.  The fact that Mr. Brandao lost over 100 pounds, that they had to petition on his behalf to have better conditions of confinement.  He was fed very infrequently.  The fact that he -- he did lose considerable weight.  The conditions themselves as far as the overpopulation --

THE COURT:  And that necessitated him to make false statements while he was in Senegal, a completely different

country, several months later?

ATTORNEY McDONOUGH:  Your Honor, I believe it was two weeks later.

THE COURT:  Two weeks later.

ATTORNEY McDONOUGH:  The evidence would suggest from the government's documents that they turned over, is that Mr. Brandao was released on bail after being held for 16 months on the offenses.  That he allegedly fled to Senegal within that two-week period of time, and that he then petitioned at the Senegal embassy to obtain a new duplicate passport.  That he was in harsh conditions of confinement during those 16 months. That he was essentially held on charges for the entire time without proceeding to trial.  That he was released, and that the -- I'm not sure how far into the justice system they would be able to get into, but the fact that there isn't a Constitution like the United --

THE COURT:  The question is whether you are going to be allowed to offer a necessity offense in the first place.

ATTORNEY McDONOUGH:  I understand that, your Honor.

THE COURT:  Are you aware of the First Circuit case in 2015, United States versus Labra-Fitz?

ATTORNEY McDONOUGH:  I am, your Honor.

THE COURT:  And how is your situation any different than that?

ATTORNEY McDONOUGH:  I think it's very different, your

Honor.  That case, if I could just pull it out, your Honor.

So I think the first difference is he's attempted to pursue a duress defense.  Which I think duress requires, as the government outlined, more of a grave harm and potential for basically imminent death if the person did not pursue whatever other course of action they had taken.  Also, he -- I believe was in the Dominican Republic for up to six months before he even attempted to apply for a passport to come to the U.S. Mr. Labra, I don't believe was a United States citizen.  He -- the Court essentially found that he had already escaped whatever harm he was subjected to when he fled to the Dominican Republic from Costa Rica.  So they said he was already evaded at least to danger of imminent death or hazard from fleeing. Whereas, Mr. Brandao is a United States citizen.  He did have a passport.  He was fleeing -- allegedly fleeing in order to reunite with his family in the United States.  And the timeline of events I think shows that things happened in rapid succession and he wasn't able to -- essentially avert the risk just by staying in Senegal or going to another country.  He was a U.S. citizen.  That was the place of safety.  Where with Labra, he was fleeing to the United States from his other alternatives.  He could have stayed in the Dominican Republic. He could have gone back and faced the charges.  He had a number of legal alternatives he could have used to avoid having to put a false statement on a passport application.  Whereas

Mr. Brandao, being a U.S. citizen, he allegedly made one false statement in order to obtain a duplicate passport to go back to where he is originally from, where his family is.  And I think it's much different than Labra where he's fleeing his home country to come to the United States where he had a number of different alternatives.  He was also pursuing a duress defense where he had to show that he was -- basically would have been killed if he would have returned to Costa Rica.

THE COURT:  Mr. Tobin or Mr. Sullivan?

ATTORNEY SULLIVAN:  Your Honor, Labra is directly on point.  We have someone who left -- was in a different country, just like the defendant here, and then at that point there is no imminent threat of danger.  So that is an element that needs to be shown, needs to be proffered in advance for presentation of the necessity defense to begin with.  The fact that 16 days later, the defendant was in another country over 400 miles away and walked into an embassy for his own country precludes necessity defense.  And as this Court has held, the danger for any necessity defense, it has to be presented as the only option.  The defendant still had the option to tell U.S. government officials about the conditions he was facing and seek help from his own government at that point.  Again, being 400 miles away in a different country, the defense doesn't apply here.

THE COURT:  Yes, I'm going to take the matter under

advisement.  But I wouldn't discount Ms. McDonough on being able to present a necessity defense in this case.  I don't see it.  But I will review the matter and give you my opinion before we impanel a jury.  But in the meantime, I wouldn't count on it, on being able to present such a defense.

ATTORNEY McDONOUGH:  Yes, your Honor.

THE COURT:  All right.

Is there anything else that we need to talk about other than the impanelment and my -- the way that I impanel juries and all of the other matters we need to talk about for a jury trial in this session?

ATTORNEY SULLIVAN:  Your Honor, the only thing was that I -- as you've noted, the suggestive identification motion came in last night.

THE COURT:  Yes.

ATTORNEY SULLIVAN:  We will put together something in writing, but just briefly I would, you know, point out every single case cited in here, the Court actually held at the identification was in fact admissible.  And here the witness that will be testifying, it was his job to not only review the picture that was submitted as part of the passport application, look up, make sure it was the same person standing right in front of him at his counter.  Also look at a past passport application, what they had on file, look at the pictures on file, also review to make sure that photograph matched the

person that was seeking the new passport.  So this interaction and the attention to detail, those factors which the Court has laid out and the Supreme Court has laid out, show that this is not an extreme or extraordinary circumstance that would justify excluding the in-court identification.

THE COURT:  All right.  I need you, the government, to file a response by the close of business, let's say, tomorrow.

ATTORNEY SULLIVAN:  Yes, your Honor.

THE COURT:  And I will make an appropriate ruling again before we impanel a jury.

All right.  Then I'm not sure whether any one of you have impanelled a criminal case before.  I mean, I know Mr. Tobin has.

ATTORNEY TOBIN:  Many years ago, your Honor.

THE COURT:  But it's been a while.  So I will go through the process of how I do it.

I do ask the potential, the panel that we have if -- to raise their hand if their answers are "Yes" to any of my questions or if they believe their answer might be "Yes."  Then if and when I get affirmative responses, I record them.  And then when the deputy picks a panel to sit in the jury box, I call each of those who have answered questions affirmatively to sidebar where I inquire about the affirmative response and allow counsel to inquire as well.  And I'm pretty liberal about the extent of questioning from counsel so long as I'm convinced

that you're trying to find a reason for causal dismissal of this particular potential juror and not that he's going to vote or he or she is going to vote for your side of the case.  If the purpose of the question is the latter, I'm going to instruct the potential juror not to answer.  But I will give you quite a lot of leeway in terms of follow-up questions to the ones that I ask.  Then, if that person is dismissed for, for reasons of cause, we obviously replace that person with somebody in the jury box.  Once I have a so-called clean slate in the jury box, and by the way, I will impanel 14 jurors, two of whom will be alternates.  What I do is I do it all together, 14 at once, understanding that you and I will know who the alternates are, but the jurors don't.  I find it works better that way that everybody, at least during the course of the trial, equally involved and that we don't go through one process of picking 12 and then another separate process of picking the two alternates.  Counsel can exercise their peremptory challenges at any stage during the course of the impanelment.  And, again, because in a twelve-person jury, the government gets six challenges and the defendant gets ten, I add one each for the alternates.  So that the government will have seven peremptory challenges.  The defendants will have eleven peremptory challenges.  You can exercise them at any stage throughout the process, understanding that the last two jurors seated, no matter what seats they're in, will be

alternate No. 1 and alternate No. 2.  I won't tell them that at the time, but you will know and I will know who the alternates are.  And I have found that that process works better in terms of the attention spans and the way alternates operate.

Now, it is slightly different than the criminal rules call for.  Is this process agreeable to the government? Mr. Tobin?

ATTORNEY TOBIN:  It is, your Honor.  Thank you.

THE COURT:  Ms. McDonough?

ATTORNEY McDONOUGH:  Yes, your Honor.

THE COURT:  Okay.

Now I'm not sure if I've gone through the entire process.  Oh, with respect to exercising peremptories, after I have a so-called clean slate in the jury box, I then ask each of the potential jurors, all 14 of them, what they do for a living, and if they're married, what their spouse does.  This is by way of amplifying the rather sparse information that you will have in writing as to each juror.  Sometimes it just says "retired."  It doesn't say retired from what.  So I do ask them what they do for a living.  And if they're married, what their spouse does.  And have a little interplay so that you can hear responses orally from the potential jurors.

Then when we come to sidebar where you may exercise peremptory challenges, in the first round the government will go first.  If the government has a challenge, it will exercise

one challenge.  Then we'll go to the defendant.  The defendant will exercise one.  Back and forth until both sides are satisfied understanding that there are no more back strikes.  Meaning, if you don't strike somebody in that first round, that person may not be stricken in a later round.

For instance, if Mr. Tobin exercises three peremptory challenges in the first round and Ms. McDonough exercises three, that leaves six vacancies.  The people who fill those six vacancies, of course, can be stricken in later rounds, but the first eight that are still sitting in the jury box cannot be stricken after that first round.

Is that clear how I do that?

ATTORNEY TOBIN:  Absolutely, your Honor.

ATTORNEY McDONOUGH:  Yes, your Honor.

THE COURT:  Okay.

I believe those are all the matters that I need to discuss.

In terms of logistics, I don't want you wandering around when you're inquiring.  In other words, when you give your opening statements, we have this portable lectern here that you can put out in front of the jury box not closer than ten feet from the jury box, and you can't wander around while you're making openings.  If you have to retrieve a document or something, of course you can do that.  But I don't want you wandering around either while you're making your openings or

during your examination of the witnesses.  And -- but the examination of the witnesses is much preferable if you do it from the fixed lectern right there by the end of the jury box rather than from counsel table.  Because, for instance, if Mr. Sullivan is inquiring of a witness, the witness tends to speak to Mr. Sullivan and forget that the jury is another 30 feet away.  So that if you have one follow-up question or something, that's fine, you can do it from counsel table.  But for the bulk of your examination, I want both counsel to examine from the lectern near the back of the jury box.

How long do you expect this trial to last?  Mr. Tobin or Mr. Sullivan?

ATTORNEY TOBIN:  Your Honor, I would anticipate because the Court works essentially a full day, no more than three days.  At least from the government's presentation.

THE COURT:  Including impanelment on the first day?  If we get -- we could very well get to some evidence on that Monday.

ATTORNEY TOBIN:  We'll be prepared with witnesses on Monday.

THE COURT:  Okay.  And we'll go to three or three-thirty on that day.  Tuesday we will not have an afternoon session.

ATTORNEY TOBIN:  Oh, okay.

THE COURT:  But Wednesday we will.  And whatever other

day you need.  So you think --

ATTORNEY TOBIN:  Given the fact that Tuesday is a day off, I would suggest --

THE COURT:  It's not a day off.

ATTORNEY TOBIN:  I'm sorry.  We'll all be diligently working.

THE COURT:  Well, it's still one o'clock.  We're going to have --

ATTORNEY TOBIN:  I misunderstood.

THE COURT:  We're not going to have an afternoon session but we will have nine to one.

ATTORNEY TOBIN:  I stand corrected.  I apologize.

THE COURT:  Okay.

ATTORNEY TOBIN:  I think that we could be done by the close of business on Wednesday even with that restriction on Tuesday.

THE COURT:  Okay.

And although, of course you are free to change your mind now, Ms. McDonough, does the defendant plan to put on a defense after the government closes?

ATTORNEY McDONOUGH:  Your Honor, that will depend on the ruling that you've taken under advisement.  And also obviously whether Mr. Brandao decides to testify.

THE COURT:  All right.

So in any event, this trial is going to be completed

during the week of September 30th, whether it's Wednesday, Thursday, or Friday.  And I'm going to tell the jury that. It's a one -- no more than a one-week trial.  Okay?

ATTORNEY McDONOUGH:  Your Honor, if I could make just a couple of more points --

THE COURT:  Yes.

ATTORNEY McDONOUGH:  -- that's a necessity issue.

I think it goes beyond just the conditions of confinement that the Court analyzed in Labra.  There's going to be evidence that Mr. Brandao was, we now know was charged with two homicide offenses in Cape Verde that he was facing, I believe it's upwards of 35 years on both in a system that maybe does not offer the same constitutional protections as the United States where Mr. Brandao may have not felt as though he was given a fair shake that he may be given in the United States.  So it's not so much just fleeing the prison confinement, but essentially just the entire system of going on trial in a place where he may not have, he wouldn't have a jury trial, he wouldn't have the other constitutional protections that we have here.  Kind of juxtaposed with the fact that his entire family lives in the United States, he's in a foreign country where he was just on vacation.  The government made a point that he fled 400 miles to Senegal.  But there's no evidence that that wasn't the closest place that he could have went to in order to attempt to get a new passport.  So I would

say it's more than just, you know, there's some thought that he may be subjected to violence or harsh conditions of confinement, but just the entire surrounding circumstances of facing all of this time, all of these charges in Cape Verde. And the fact that he is a U.S. citizen and that may have been his only alternative to potentially serving a very long period of time where the evidence may not have been solid over in Cape Verde. So that would be our point on that, your Honor. And I'll rest on my filing as well.

THE COURT: Okay, Mr. Sullivan, you wish to respond?

ATTORNEY SULLIVAN: Just briefly, your Honor.

One, just so the Court's aware, there is a U.S. embassy in Praia, Cape Verde as well. That's the city where he was released.

And, two, the Labra case, actually, had nothing to do with confinement. That just had to do with death threats that the individual fled from the Dominican Republic. But, again, the fundamental point is when you get to another country, away from the danger, you cannot say that is an imminent danger that you are facing.

Also with the alternative, I'll just reiterate, he was in a U.S. embassy with the protection of his government. He could have sought -- he could have told the truth and asked the help of his government to avoid these objectionable conditions. You're not just entitled to lie at that point. It's not a

necessity defense, your Honor.

THE COURT:  All right.  I will consider the matter and make a ruling at the appropriate time.  Let's see if I've covered all of my questions.

How long do you expect to need for an opening, Mr. Sullivan?

ATTORNEY SULLIVAN:  No more than 15 minutes, your Honor.

ATTORNEY McDONOUGH:  I would say the same for the defense, your Honor.

THE COURT:  Fifteen minutes is fine for openings in such a case.  And so that will be a part of the ruling.

Are there any other issues that need to come to my attention?  For instance, is there any possibility of a change of plea between now and September 30th?

ATTORNEY TOBIN:  I leave that to the defense, your Honor.  We're certainly open to negotiations and consideration.

ATTORNEY McDONOUGH:  Your Honor, we did have a brief conversation.  It was my impression that the government was asking very close to the statutory maximum.  I don't know if that's changed, but that was the impression I got from our conversation.

ATTORNEY TOBIN:  Your Honor, my understanding has been from the very beginning of this case that the defendant has not expressed any interest in negotiations or pleading.  My

discussions with counsel about sentence is clearly indicated after a contested jury trial what the government's position may well be. If the defense is interested in communicating with the government about a possible pretrial resolution, we certainly are -- we're always amenable.

THE COURT: You have a little more time than you normally do. Normally these final pretrial conferences are just two or three days before trial. In this case it's about 10 or 12. So I urge counsel if there is going to be any -- a possibility of negotiations, that they take place. Obviously the Court will not be involved in those negotiations, but I urge you to reconsider your respective positions and do what you can. And of course if you come to the resolution, the Court will expect to be notified promptly, because it is going to be taking some action in this case and needs to pay attention to it.

So unless there are any further matters that need my attention -- yes, Ms. McDonough.

ATTORNEY McDONOUGH: Your Honor, I just had one logistic matter I wanted to alert the Court to.

THE COURT: Yes.

ATTORNEY McDONOUGH: Just knowing that you're going to be out of the country. Mr. Brandao -- I plan to file a motion to amend his GPS just so he can leave his house.

THE COURT: To amend?

ATTORNEY McDONOUGH:  His GPS time so he can leave the house a little bit earlier to arrive to court on time for trial.  Right now it's at seven and he does live in Brockton.  So I just wanted to alert your Honor that I would file a motion to amend.

THE COURT:  The government have opposition to that?

ATTORNEY TOBIN:  There is not, your Honor.

THE COURT:  The Court would allow a reasonable modification.  I don't know what it's going to look like.  That, of course, has to go through the probation officer.  And I take it if he or she is for it, I will allow it.

ATTORNEY McDONOUGH:  Okay.  Thank you, your Honor.

ATTORNEY TOBIN:  And, your Honor, just lastly, again, we will get you those documents today.  I understand the limitations that were placed upon you by getting them to you so late.  But for what it's worth, it would be, I think, critical to both sides for the Court to know the status of those Cape Verdean documents before openings.

THE COURT:  Yes.

ATTORNEY TOBIN:  Thank you, sir.

THE COURT:  Thank you.  Thank you, counsel.  We are adjourned.

THE CLERK:  All rise.

(The Honorable Court Exited.)

(Whereupon, at 10:07 a.m., Court Stood in Recess.)

**C E R T I F I C A T E**

**UNITED STATES DISTRICT COURT )**

**DISTRICT OF MASSACHUSETTS    )**

I, Catherine L. Zelinski, certify that the foregoing is a true and accurate transcription of my stenographic notes from the record of proceedings taken Wednesday, September 18, 2024, in the above-entitled matter to the best of my skill and ability.

/s/ Catherine L. Zelinski

Catherine L. Zelinski, RPR, CRC    ___8/8/2025____
Official Court Reporter                    Date